UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                          Case No. 8:10-CR-136-T-30EAJ

MICHELLE DUVAL
_____/

DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION

Ms. Michelle Duval submits this reply brief to clarify that she qualifies for compassionate release under the standard set forth by the 11th Circuit in a decision handed down after she filed her initial motion. *United States v. Bryant*, No. 19-14267, 2021 WL 1827158 at *1 (11th Cir. May 7, 2021). Ms. Duval's medical conditions substantially diminish her ability to provide self-care within a correctional facility and are not adequately treated by the BOP, satisfying the criteria for compassionate release in this circuit. Ms. Duval also rebuts the government's assertions that she was never approved for home confinement and that she refused the COVID-19 vaccine.

Diverging from the seven other circuits that have considered the issue, the 11th Circuit held that district courts may not reduce a sentence unless the movant satisfies the criteria in the U.S. Sentencing Commission policy statement, § 1B1.13. *Id.* at *13; *id.* at *18 (Martin, J., dissenting). The D.C. Circuit then became the eighth court of appeals to hold that applying the Sentencing Guidelines is

plain error: "[T]he combination of clear text and overwhelming and vigorously reasoned authority from seven other circuits (and the unpersuasiveness of the Eleventh Circuit's analysis) make the error plain." *United States v. Long*, No. 20-3064, 2021 WL 1972245, at *26 (D.C. Cir. May 18, 2021).

## I. MS. DUVAL'S POOR HEALTH MAKES HER ELIGIBLE FOR A SENTENCE REDUCTION

Even under the Sentencing Commission guidelines, Ms. Duval qualifies for a reduction in sentence. The 11th Circuit currently mandates that a court "simply considers a defendant's specific circumstances, decides if he is dangerous, and determines if his circumstances meet any of the four reasons [under § 1B1.13] that could make him eligible for a reduction." *Bryant*, 2021 WL 1827158 at *7. Ms. Duval meets the criteria for Subsection A of § 1B1.13: "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of the correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, application note 1(A). Ms. Duval cannot take care of herself in prison because she cannot protect herself from COVID-19. She cannot care for herself because FCI Danbury will not provide her with a medically appropriate sleeping arrangement, allow her to consult with a doctor regarding whether she should take the COVID-19 vaccine, or manage her many pre-existing conditions, such as COPD, asthma, type 2

diabetes, obesity, and hypertension. COPD has no cure and thus she is not expected to regain full use of her lungs.[1]

### A. Self-Care in a Prison Environment Means Having Access to Resources that Allow a Person to Protect Their Health

No one challenges the fact that Ms. Duval suffers from numerous and serious medical conditions. The government argues that Ms. Duval can care for herself because she is not incapacitated, but that is not the correct standard. "The presence of COVID-19, though, necessitates a more expansive interpretation of what self-care means." *United States v. Esparza*, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *3 (D. Idaho Apr. 7, 2020). In the era of COVID, self-care means protecting oneself within the environment of a correctional facility from contracting COVID-19 by being able to perform the "self-care actions the CDC recommends to prevent contracting COVID-19 - such as social distancing and constant sanitization of living spaces." *United States v. Rodriguez*, 476 F. Supp. 3d 1071, 1076 (S.D. Cal. 2020); *United States v. Northcutt*, No. CR 04-72, 2021 WL 615207, at *3 (W.D. Pa. Feb. 17, 2021) (granting release in part because movant's "ability to provide self-care, including social distancing, is constrained in a prison environment").

The ability to administer self-care is critical for incarcerated people with chronic conditions such as Ms. Duval. *United States v. Fortune*, No. 4:09-CR-40082,

---

[1] Ctrs. for Disease Control & Prevention, *What is COPD?* (last reviewed Feb. 22, 2021), https://www.cdc.gov/copd/index.html.

2021 WL 719890, at *4 (C.D. Ill. Feb. 24, 2021) (accepting "the proposition that a chronic condition may . . . 'diminish[ ] the ability . . . to provide self-care'" in a prison because of COVID-19); *United States v. Villafuerte-Diaz*, No. 19-CR-1063-GPC, 2020 WL 4336349 (S.D. Cal. July 28, 2020) (same). For instance, an incarcerated person recovering from surgery or one with a compromised immune system "cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus." *United States v. Ramirez*, 459 F. Supp. 3d 333, 339 (D. Mass. 2020) (citations omitted). Here, Ms. Duval suffers from obesity, type 2 diabetes mellitus, COPD, hypertension, and asthma, all of which the CDC identifies as increasing the risk of severe illness or death from COVID-19. In particular, "many courts have observed that obesity and high blood pressure are particularly worrying medical conditions as they relate to the risk of severe illness or death from COVID-19." *Northcutt*, 2021 WL 615207, at *3. Furthermore, Ms. Duval uses a mometasone inhaler twice a day to manage her asthma, and it has been shown that fatality rates from COVID-19 are higher in those who use mometasone. *United States v. Staats*, ---F. Supp. 3d---, 2020 WL 6888224, at *4 (E.D. Pa. Nov. 24, 2020) (citing study).[2]

These conditions substantially diminish Ms. Duval's ability to administer self-care, but Ms. Duval's situation is particularly dire as FCI Danbury staff are

---

[2] The OpenSAFELY Collaborative et al., *Open SAFELY: factors associated with COVID-19-related hospital deaths in the linked electronic health records of 17 million adult NHS patients*, (May 7, 2020), https://www.medrxiv.org/content/10.1101/2020.05.06.20092999v1.full.pdf.

not motivated to help her. Medical staff have not made an appointment with a pulmonologist, despite being aware of her continued troubles breathing. Ex. H at 17. Ms. Duval currently sleeps propped up on books and pillows so that she can breathe throughout the night because the chair she slept in was taken away. Moreover, Ms. Duval's CPAP machine cord is frequently tripped over and unplugged throughout the night because staff moved her from a cell that had an electrical outlet. The government represents that Ms. Duval has not shown her conditions "inhibit her ability to provide self-care" and maintains that her "conditions are being treated in the BOP." Gov't Opp. at 4. Over 800 pages of medical records tell a very different story of ignoring symptoms, dismissing concerns, and failing to provide minimal chronic care. Ms. Duval cannot provide self-care if she cannot plug in her CPAP machine, cannot social distance in a prison environment, and cannot obtain the specialist care she needs.

Although the government in this case clings to a narrow definition of self-care, in similar cases the government has acknowledged that medical conditions like Ms. Duval's "substantially diminish[] the ability to provide self-care within the environment of a correctional facility[.]" *United States v. Butler*, No. CR 10-612, 2020 WL 5369753, at *2 (E.D. Pa. Sept. 8, 2020) (citation omitted). The government admitted that Butler's obesity "unquestionably meets the test for an 'extraordinary and compelling reason' set forth in application note 1(A), as the condition puts him at risk for a severe outcome were he to contract

5

COVID-19." *Id.* The court also noted that Butler's hypertension and sleep apnea, taken together with his obesity, constituted extraordinary and compelling reasons that justified his immediate release from incarceration. *Id.* at *3. Like Mr. Butler, Ms. Duval suffers from obesity, sleep apnea, and hypertension as well as several other conditions identified by the CDC as putting her at increased risk of an adverse outcome from COVID-19. Therefore, she satisfies the Guideline requirement that she be incapable of self-care and thus "unquestionably" meets the test for an extraordinary and compelling reason for compassionate release.

## II.  The Availability of a Vaccine Does Not Preclude Compassionate Release

The government misstates Ms. Duval's position regarding the COVID-19 vaccine. First, Ms. Duval did not refuse the vaccine. *See* Gov't Opp. at 3, 8. Second, her hesitancy says nothing about the gravity of her medical condition. The vaccine is not a panacea. *United States v. Pappa*, No. 95-00084-CR, 2021 WL 1439714, at *4, n.4 (S.D. Fla. Apr. 1, 2021). Even if Ms. Duval accepts the vaccine after consulting a doctor, that would also not affect her eligibility for compassionate release. *United States v. Spriggs*, No. CR CCB-10-364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (deciding that a defendant with obesity, hypertension, and risk of heart disease who had received one dose of the vaccine was still eligible for compassionate release based on his medical conditions). Making vaccination a bar to compassionate release would create a perverse incentive to decline the vaccine, which would be highly detrimental. *Id.* Finally,

6

the vaccine may not be effective on people with obesity, such as Ms. Duval, so she remains at risk of severe illness from COVID-19. *Pappa*, 2021 WL 1439714, at *4, n.4. Thus, the vaccine alone does not preclude compassionate release based on the threat of contracting COVID-19 in prison for someone with underlying health conditions.

### A. Ms. Duval Did Not Refuse the COVID-19 Vaccine

Ms. Duval did not refuse the COVID-19 vaccine. Ex. N at 2-3. Given her numerous medical conditions (asthma, obstructive sleep apnea, COPD, essential hypertension, seizure disorder, type 2 diabetes mellitus, glaucoma and myopia, peripheral neuropathy, gastroesophageal reflux, uterine fibroids with abnormal uterine bleeding, morbid obesity, and generalized anxiety disorder), Ms. Duval understandably wishes to consult with her primary doctor, Dr. Green, before taking the vaccine. *Id.* at 3. When Mr. Gibson, a member of the medical staff, offered Ms. Duval the vaccine, he recommended she consult with Dr. Green, acknowledging that her desire to seek medical advice did not constitute a refusal of the vaccine. *Id.* at 2. On February 24, 2021, Ms. Duval filled out a BP-A0148 requesting to speak with Dr. Green about the safety of the vaccine. *Id.* It is not uncommon for an individual to defer receiving a vaccine until after they have consulted with a trusted medical professional.[3] *See* Ex. J at 12.

---

[3] *Covid-19 Vaccine Acceptance in California State Prisons*, The New England Journal of Medicine (May 12, 2021), https://www.nejm.org/doi/full/10.1056/NEJMc2105282?query=TOC ("Fewer than half of young, Black residents accepted at least one dose (Fig. S2), a finding that may reflect

The government maintains that the BOP "continues to be willing to provide" Ms. Duval with the COVID-19 vaccine, but ignores Ms. Duval's need to consult with her primary doctor to determine whether she can safely take the vaccine. *See* Gov't Opp. at 3. The government asserts that the proper avenue for addressing Ms. Duval's dissatisfaction with medical treatment is through a BOP grievance. Gov't Opp. at 10. Ms. Duval has filed numerous staff requests, letters, and grievances, none of which have resulted in any relief. See, e.g., Ex. F at 1-3; Ex. M. Finally, it is remarkable that the government chides Ms. Duval for not filing a grievance (which she did) while FCI Danbury and the BOP are ignoring court orders to change their practices regarding COVID-19. Ex. I.

### B. Courts Have Found That Health Conditions Similar to Ms. Duval's Constitute Extraordinary and Compelling Reasons for Compassionate Release.

The government ignores key factual differences when it asserts that multiple courts within the Middle District of Florida have found that individuals with medical conditions similar to Ms. Duval could not show "extraordinary and compelling" circumstances. Gov't Opp. at 8. Unlike the defendant in *United States v. Rey-Durier*, who provided no proof of his medical issues, Ms. Duval has amply documented her medical problems. She included 200 pages in her initial motion, which she is supplementing with 600 additional pages to address the

---

mistrust in correctional authorities and clinicians or a lack of access to reliable information on vaccine safety and efficacy.").

government's concern that it did not have access to the full medical record. *See* Gov't Opp. at 7 (relying on No. 8:15-cr-97-T-27TGW, 2020 WL 4349941, at *2).

The government also equates this case with two others in which the defendants had far fewer health concerns. Gov't Opp. at 8. Ms. Duval's medical conditions are substantially different from these cases because she has five conditions the CDC lists as placing an individual at a higher risk for complications from COVID-19 rather than two: obesity, hypertension, type 2 diabetes, COPD, and asthma. *Compare* Ex. J at 10-11 *with United States v. Hayes*, No. 3:18-cr-37-J-34JBT, 2020 WL 3611485, at 2* (M.D. Fla. July 2, 2020) (denying compassionate release to a defendant with hypertension and obesity) and *United States v. Pennington*, No 3:16-cr-61-J-39MCR, Doc 181 (M.D. Fla. May 11, 2020) (denying compassionate release to a defendant with just obesity). Having one or even two medical conditions identified by the CDC as increasing the risk of severe COVID-19 complications may not warrant release, but Ms. Duval has five risk-factors (and other comorbidities as well) which meets the extraordinary and compelling standard.

Finally, the government asserts that "[c]hronic conditions that can be managed in prison are not a sufficient basis for compassionate release." Gov't Opp. at 10. But the question is not whether the conditions can be managed but whether they are being handled, which is not happening in Ms. Duval's case. *United States v. Douglas*, No. CR 10-171-4 (JDB), 2021 WL 214563, at *6 (D.D.C. Jan.

9

21, 2021) (granting compassionate release in part because the BOP failed to control movant's dangerously high blood pressure). In this case, by not providing Ms. Duval with adequate sleeping arrangements, the BOP is not adequately managing Ms. Duval's chronic conditions, and it is not providing her with the necessary tools to do so herself. Many individuals at FCI Danbury have reported waiting weeks or months before being seen after reporting urgent medical concerns in multiple sick call slips, and individuals, like Ms. Duval, who need outside consultations have been left waiting for them for months. Ex. I at 28.

### III. BOP Staff Led Ms. Duval to Believe They Were Granting Her Home Confinement, Only to Later Deny her Request

Ms. Duval's physical problems have been exacerbated by the "bait and switch" tactics of the BOP regarding releasing people to home confinement in response to the COVID-19 pandemic. The government asserts, without documentation, that Ms. Duval was never approved for home confinement. Gov't Opp. at 10. Ms. Duval, and several other women at Danbury, were told they were going home or – at the very least – Danbury staff took several measures that would lead any reasonable person to believe that they were going to be approved for home confinement. Ex. E at 1.

On May 28th, 2020, Ms. Duval's case manager, Mr. McMahon, told her she was approved for home confinement. Ex. O at 4. That same day, Ms. Duval and

Mr. McMahon both signed a BP-A0548 Home Confinement and Community Control Agreement and a BP-A0434 Community Based Program Agreement. *Id.* at 1-2. Ms. Duval also signed a BP-A0460 Conditions of Home Detention form and a Home Confinement Referral Form. *Id*. at 3-4; Ex. E at 1. On May 29th, 2020, Ms. Duval called her son, Treon Duval, to tell him to install a landline, which he did. Ex. O at 4; Ex. P. A probation officer came out to inspect his home and approved it. Ex. F at 3. Then, on June 5th, 2020, Ms. Duval's case manager told her and several other women who believed that they were being released that they would not be going home after all. Ex. E at 1. When Ms. Duval pressed for an explanation for the denial, she was told: "why don't you ask those big time attorneys you have[?]" *Id.* Ms. Duval was not the only one to be taken in by the false promise of home confinement. Danbury staff placed one woman in quarantine to prepare for her release, only to pull her out of quarantine and tell her she was not going home after all. *Id.* at 2.

### IV. Ms. Duval Is Not a Danger to Society

The government's portrayal of Ms. Duval as a dangerous criminal is inaccurate. Although she has a history of drug-related convictions, she is currently incarcerated for possession of a firearm in her house, not while committing a crime. Her assault charge stemmed from a scuffle with a store security officer decades ago. Ms. Duval's disciplinary history during her sentence has been trivial and her security level is low. Ex. C at 2. Given Ms. Duval's poor

health, it is unlikely she would return to a life of crime. Her son has observed that she has matured during her incarceration. Ex. A at ¶10; Ex. L at 4 (stating Ms. Duval is focused on her goals); *id* at 5 ("she has the coping skills to succeed in her future"); *id.* at 17 (she has "shown growth"). She has repaired relations with her family members and has found purpose in using her entrepreneurial skills to expand her son's businesses. Ex. A at ¶10; Ex. L at 3 (letter from daughter stating she wants Ms. Duval to be able to establish a relationship with her grandchildren). Her niece writes: "My aunt is very loving and caring, and will give you the shirt off her back. I know that the person she is, she has rehabilitated in a positive way and will do whatever it takes to be the outstanding person that we know she is." Ex. L. as 22. Far from being a danger to the community, she is poised to contribute once she can get her medical issues under control.

## V. Conclusion

For the reasons given in her motion and in this reply, Ms. Duval respectfully asks this Court to grant her motion for compassionate release.

Respectfully submitted,

By: /s/ Alexis Alvarez
Alexis Alvarez, Esq.
Fla. Bar No.: 120069
Attorney
Florida Legal Services
P.O. Box 533986
Orlando, FL 32853

(407) 553-2075 (direct)
(407) 505-7327 (fax)

/s/ Catherine Sevcenko
*Pro Hac Vice*
Bar No 484218
National Council for Incarcerated and
Formerly Incarcerated Women and Girls
300 New Jersey Ave, NW #900
Washington DC 20001
617-299-2604 x703

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this motion was served via ECF to all counsel of record, this 3th day of June, 2021.

/s/ Alexis Alvarez
Alexis Alvarez, Esq.
Fla. Bar No.: 120069

13